UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| RONNIE LEE SANDERS, | 19-cv-410 |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| SMITH DEBNAM NARRON DRAKE SAINTSING & MYERS, LLP, | |
| Defendants. | |

## COMPLAINT

Plaintiff RONNIE LEE SANDERS ("Mr. Sanders"), complaining of Defendant SMITH DEBNAM NARRON DRAKE SAINTSING & MYERS, LLP ("Smith Debnam"), shows the Court:

1. Mr. Sanders brings this action for actual and statutory damages, against Defendant for deceptive debt collection practices that violated Federal law – specifically, for its act of filing a lawsuit against Mr. Sanders for a debt he did not owe.

### II. Parties

2. Plaintiff Ronnie Lee Sanders is a natural person who, at all times relevant to the events described in this Complaint, has lived in Greensboro, North Carolina.

3. Mr. Sanders is a "consumer" as that term is defined by 15 U.S.C. §1692a(3), which is part of the Fair Debt Collection Practices Act ("FDCPA").

1

4. Defendant Smith Debnam Narron Drake Saintsing & Myers, LLP ("Smith Debnam") is a limited liability partnership and a law firm, organized and existing under the laws of the State of North Carolina. Its principal place of business is located at 4601 Six Forks Rd., Ste. 400, Raleigh, NC 27609.

5. Smith Debnam's website lists one of its practice areas as "Creditors' Rights & Collections." Its website further states that its clients include "Banks, Finance companies, . . . Debt buyers, Collection agencies, Credit unions, . . . [and] Mortgage companies," and that it is "equipped to handle . . . routine commercial and consumer collections . . . ." Smith Debnam's website also lists one of its "Services Offered" as "Collection Litigation."

6. Acting on behalf of its various clients, Smith Debnam has filed several lawsuits against North Carolina consumers to collect consumer debts. Smith Debnam also regularly sends debt-collection letters to North Carolina consumers on behalf of its clients.

7. For the foregoing reasons, Smith Debnam is a "debt collector" as that term is defined by 15 U.S.C. § 1692(a)(6).

### III. Jurisdiction & Venue

8. This Court has federal question jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

9. Venue is proper in this district under 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claim occurred within this district, specifically: The lawsuit was filed and served within this district.

2

## IV. Factual Allegations

10. In early June 2017, Mr. Sanders purchased a 2011 Ford Edge from Vann York Chevrolet, Inc. ("Vann York") in High Point, NC.

11. Mr. Sanders started having problems with the Edge's transmission and power system as soon as he drove it off the lot.

12. Specifically, when he tried to shift the transmission, the whole vehicle started to jerk. Also, the power windows and the power sunroof did not work, and the rear backup camera did not work properly.

13. Mr. Sanders test-drove the Edge before he signed the papers, but, on information and belief, Vann York intentionally hid the problems with the transmission and the power system. Before the test drive began, a Vann York employee had already pulled the Edge out of its parking spot and pointed it toward the road. Also, the Vann York employee had put the air conditioning on full-blast, so Mr. Sanders never thought to roll down the windows.

14. Mr. Sanders called Vann York several times to complain about the problems. Vann York told Mr. Sanders they would fix the Edge, but kept on putting Mr. Sanders off, saying that the parts hadn't come in yet.

15. Finally, about two weeks after Mr. Sanders bought it, he took the Edge to Vann York. When he got there, Vann York told him that they hadn't even ordered parts for the Edge. Instead, Vann York said they would take the Edge back and sell Mr. Sanders a different vehicle, which turned out to be a 2016 Nissan Murano.

16. Vann York led Mr. Sanders to believe that it would be canceling the Edge purchase, and selling him a Murano instead. Vann York told Mr. Sanders that the Murano had no mechanical problems and that it was fully loaded.

17. Much later, Mr. Sanders realized that Vann York had treated the Ford Edge as a trade-in. Instead of canceling the sale of the Edge, Vann York added all the negative equity from the loan on the Edge into another loan for the Murano.

18. Vann York immediately assigned the loan that financed the purchase of the Murano to First Technology Federal Credit Union ("First Tech").

19. As soon as Mr. Sanders got into the Murano to drive it home, he knew that Vann York had tricked him a second time, because the Murano had the exact same problems with the transmission and the power system, and it was not fully loaded.

20. That same day Mr. Sanders made a phone call to Vann York to say he did not want the Murano because it did not match up with what Vann York agreed to sell him. Vann York refused to take it back.

21. Mr. Sanders also called First Tech that day, telling them not to send any money to Vann York, because Vann York had misled him about the car and he was going to cancel his purchase.

22. Over the next several days, Mr. Sanderfs called First Tech several times, and each time, he told the First Tech employee he talked to about the problems with the Murano; that he was going to cancel his purchase and return the Murano; and that First Tech should not send any money to Vann York.

23. Vann York ignored Mr. Sanders's complaints. The First Tech employees were courteous, but never acknowledged that Mr. Sanders had the right to revoke acceptance of the Murano, nor gave him instructions on what to do with the collateral.

24. Eventually, Mr. Sanders took the Murano back to Vann York and left it in the parking lot.

25. During a telephone call, Mr. Sanders told a First Tech employee that he had left the Murano at Vann York.

26. First Tech then took possession of the Murano and, treating it like a repossession governed by Article 9 of the Uniform Commercial Code, sold the Murano.

27. On April 16, 2018, First Tech – through its attorneys Smith Debnam – filed a debt collection lawsuit against Mr. Sanders in the Guilford County District Court to collect $11,829.41, plus interest and attorney fees. In the state court complaint, Smith Debnam alleged that this was the deficiency that remained on the loan that had financed the purchase of the Murano, following the sale of the Murano. A copy of the state court summons and complaint filed by Smith Debnam is attached to this Complaint as <u>Exhibit A</u>.

28. In the state court action that followed, Mr. Sanders alleged counterclaims against First Tech under Article 9 of the Uniform Commercial Code. First Tech responded by moving to compel arbitration of Mr. Sanders's counterclaims.

5

Case 1:19-cv-00410-UA-JEP   Document 1   Filed 04/16/19   Page 5 of 7

29. In response, Mr. Sanders argued that, because he had revoked acceptance of the Murano and terminated the purchase contract, the contract's arbitration clause was not binding on Mr. Sanders.

30. At oral argument on First Tech's motion to compel, First Tech's attorney conceded that Mr. Sanders had revoked acceptance of the Murano and terminated the purchase contract.

31. Based on First Tech's concession, the Guilford County District Court dismissed both First Tech's deficiency claim and Mr. Sanders's Article 9 counterclaims.

## COUNT ONE
## Violation of the Fair Debt Collection Practices Act
## (15 U.S.C. § 1692 *et seq.*)

32. Plaintiff incorporates by reference the allegations of paragraphs 1 through 31 as if fully repeated here.

33. The state court complaint prepared and filed by Smith Debnam was a "communication" as that term is defined in 15 U.S.C. § 1692a(2) of the FDCPA.

34. The state court complaint, which falsely stated that Mr. Sanders owed a $11,829.41 debt and which threatened Mr. Sanders with a deficiency judgment, was a false representation of the character, amount, and legal status of a debt that violated 15 U.S.C. § 1692e(2)(A) of the FDCPA. It was also an action that Smith Debnam was not legally permitted to take, as well as threat to take action that Smith Debnam was not legally permitted to take, that violated 15 U.S.C. § 1692e(5)

6

of the FDCPA. Finally, it was a false representation and deceptive means to attempt to collect a debt that violated 15 U.S.C. § 1692e(10) of the FDCPA.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a trial by jury on all claims herein so triable.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff Ronnie Sanders prays he be awarded:

A. Actual damages;

B. $1,000 is statutory damages;

C. Attorney fees, litigation expenses, and costs; and

D. Any other relief that this Court deems appropriate under the circumstances.

Dated: April 16, 2019
    Winston-Salem, NC

                **LAW OFFICE OF JONATHAN R. MILLER, PLLC**
                **d/b/a SALEM COMMUNITY LAW OFFICE**

                By: /s/ Jonathan R. Miller
                      Jonathan R. Miller
                      Plaintiff's Attorney

7

Case 1:19-cv-00410-UA-JEP   Document 1   Filed 04/16/19   Page 7 of 7