UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RONNIE LEE SANDERS, | ) | 19-cv-410 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| SMITH DEBNAM NARRON DRAKE SAINTSING & MYERS, LLP and FIRST TECHNOLOGY FEDERAL CREDIT UNION, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

# COMPLAINT

Plaintiff RONNIE LEE SANDERS ("Mr. Sanders"), complaining of Defendant SMITH DEBNAM NARRON DRAKE SAINTSING & MYERS, LLP ("Smith Debnam") and FIRST TECHNOLOGY FEDERAL CREDIT UNION ("First Tech"), shows the Court:

1. Mr. Sanders brings this action for actual and statutory damages, against Defendants for deceptive debt collection practices – specifically, for their attempts to collect a debt that Mr. Sanders never owed – that violated Federal and North Carolina law.

## II. Parties

2. Plaintiff Ronnie Lee Sanders is a natural person who, at all times relevant to the events described in this Amended Complaint, has lived in Greensboro, North Carolina.

1

3. Mr. Sanders is a "consumer" as that term is defined by 15 U.S.C. §1692a(3), which is part of the Fair Debt Collection Practices Act ("FDCPA").

4. Defendant Smith Debnam Narron Drake Saintsing & Myers, LLP ("Smith Debnam") is a limited liability partnership and a law firm, organized and existing under the laws of the State of North Carolina. Its principal place of business is located at 4601 Six Forks Rd., Ste. 400, Raleigh, NC 27609.

5. Smith Debnam's website lists one of its practice areas as "Creditors' Rights & Collections." Its website further states that its clients include "Banks, Finance companies, . . . Debt buyers, Collection agencies, Credit unions, . . . [and] Mortgage companies," and that it is "equipped to handle . . . routine commercial and consumer collections . . . ." Smith Debnam's website also lists one of its "Services Offered" as "Collection Litigation."

6. Acting on behalf of its various clients, Smith Debnam has filed several lawsuits against North Carolina consumers to collect consumer debts. Smith Debnam also regularly sends debt-collection letters to North Carolina consumers on behalf of its clients.

7. For the foregoing reasons, Smith Debnam is a "debt collector" as that term is defined by 15 U.S.C. § 1692(a)(6).

8. Defendant First Technology Federal Credit Union ("First Tech") is a federal credit union organized and existing under the laws of the United States. Its principal place of business is 2702 Orchard Pkwy., San Jose, CA 95134.

9. On information and belief, First Tech extends credit for the purchase of personal vehicles to consumers nationwide.

10. To the extent that First Tech engages, directly or indirectly, in collection of obligations owed or alleged to be owed in connection with the auto loans it makes, it is a "debt collector" as that term is defined by N.C. Gen. Stat. § 75.50(3).

### III. Jurisdiction & Venue

11. This Court has federal question jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

12. Venue is proper in this district under 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claim occurred within this district, specifically: The lawsuit was filed and served within this district.

13. This Court has supplemental jurisdiction over Plaintiff's North Carolina state law claims under 28 U.S.C. § 1367, in that his state law claims are so related to his FDCPA claims that they form part of the same case or controversy.

### IV. Factual Allegations

14. In early June 2017, Mr. Sanders purchased a 2011 Ford Edge from Vann York Chevrolet, Inc. ("Vann York") in High Point, NC.

15. Mr. Sanders started having problems with the Edge's transmission and power system as soon as he drove it off the lot.

16. Specifically, when he tried to shift the transmission, the whole vehicle started to jerk. Also, the power windows and the power sunroof did not work, and the rear backup camera did not work properly.

17. Mr. Sanders test-drove the Edge before he signed the papers, but, on information and belief, Vann York intentionally hid the problems with the transmission and the power system. Before the test drive began, a Vann York employee had already pulled the Edge out of its parking spot and pointed it toward the road. Also, the Vann York employee had put the air conditioning on full-blast, so Mr. Sanders never thought to roll down the windows.

18. Mr. Sanders called Vann York several times to complain about the problems. Vann York told Mr. Sanders they would fix the Edge, but kept on putting Mr. Sanders off, saying that the parts hadn't come in yet.

19. Finally, about two weeks after Mr. Sanders bought it, he took the Edge to Vann York. When he got there, Vann York told him that they hadn't even ordered parts for the Edge. Instead, Vann York said they would take the Edge back and sell Mr. Sanders a different vehicle, which turned out to be a 2016 Nissan Murano.

20. Vann York led Mr. Sanders to believe that it would be canceling the Edge purchase, and selling him a Murano instead. Vann York told Mr. Sanders that the Murano had no mechanical problems and that it was fully loaded.

21. Much later, Mr. Sanders realized that Vann York had treated the Ford Edge as a trade-in. Instead of canceling the sale of the Edge, Vann York added all the negative equity from the loan on the Edge into another loan for the Murano.

22. Vann York immediately assigned the loan that financed the purchase of the Murano to First Technology Federal Credit Union ("First Tech").

23. As soon as Mr. Sanders got into the Murano to drive it home, he knew that Vann York had tricked him a second time, because the Murano had the exact same problems with the transmission and the power system, and it was not fully loaded.

24. That same day Mr. Sanders made a phone call to Vann York to say he did not want the Murano because it did not match up with what Vann York agreed to sell him. Vann York refused to take it back.

25. Mr. Sanders also called First Tech that day, telling them not to send any money to Vann York, because Vann York had misled him about the car and he was going to cancel his purchase.

26. Over the next several days, Mr. Sanders called First Tech several times, and each time, he told the First Tech employee he talked to about the problems with the Murano; that he was going to cancel his purchase and return the Murano; and that First Tech should not send any money to Vann York.

27. Vann York ignored Mr. Sanders's complaints. The First Tech employees were courteous, but never acknowledged that Mr. Sanders had the right to revoke acceptance of the Murano, nor gave him instructions on what to do with the collateral.

28. Eventually, Mr. Sanders took the Murano back to Vann York and left it in the parking lot.

29. During a telephone call, Mr. Sanders told a First Tech employee that he had left the Murano at Vann York.

5

30. On September 20, 2017, First Tech sent Mr. Sanders a collection letter demanding stating that his account was "seriously delinquent" and demanding payment of $1,436.70. A copy of the letter is attached to this Amended Complaint as **Exhibit A**.

31. First Tech then took possession of the Murano.

32. On September 28, 2017, First Tech sent Mr. Sanders a second collection letter stating that it intended to sell the Murano, and also stating that, if the sale realized less than Mr. Sanders' amount due, Mr. Sanders could be liable for the difference. A copy of the letter is attached to this Amended Complaint as **Exhibit B**.

33. Then, continuing to treat the Murano as collateral that had been repossessed under Article 9 of the Uniform Commercial Code, sold the Murano at a private sale.

34. On November 2, 2017, First Tech sent Mr. Sanders a third collection letter stating that, after the sale of the sale of the Murano, Mr. Sanders still owed $11,131.23, and threatening "further collection measures" if Mr. Sanders failed to remit that amount. A copy of this letter is attached to this Amended Complaint as **Exhibit C**.

35. On April 16, 2017, First Tech – through its attorneys Smith Debnam – filed a debt collection lawsuit against Mr. Sanders in the Guilford County District Court to collect $11,829.41, plus interest and attorney fees. In the state court complaint, Smith Debnam alleged that this was the deficiency that remained on the

6

loan that had financed the purchase of the Murano, following the sale of the Murano. A copy of the state court summons and complaint filed by Smith Debnam is attached to this Amended Complaint as <u>Exhibit D.</u>

36. In the state court action that followed, Mr. Sanders alleged counterclaims against First Tech under Article 9 of the Uniform Commercial Code. First Tech responded by moving to compel arbitration of Mr. Sanders's counterclaims.

37. In response, Mr. Sanders argued that, because he had revoked acceptance of the Murano and terminated the purchase contract, the contract's arbitration clause was not binding on Mr. Sanders.

38. At oral argument on First Tech's motion to compel, First Tech's attorney conceded that Mr. Sanders had revoked acceptance of the Murano, thus terminating the purchase contract.

39. Based on First Tech's concession, the Guilford County District Court dismissed both First Tech's deficiency claim and Mr. Sanders's Article 9 counterclaims.

**COUNT ONE**
**Violation of the Fair Debt Collection Practices Act**
**(15 U.S.C. § 1692 *et seq.*)**

40. Plaintiff incorporates by reference the allegations of paragraphs 1 through 39 as if fully repeated here.

41. The state court complaint prepared and filed by Smith Debnam was a "communication" as that term is defined in 15 U.S.C. § 1692a(2) of the FDCPA.

7

42. The state court complaint, which falsely stated that Mr. Sanders owed a $11,829.41 debt and which threatened Mr. Sanders with a deficiency judgment, was a false representation of the character, amount, and legal status of a debt that violated 15 U.S.C. § 1692e(2)(A) of the FDCPA. It was also an action that Smith Debnam was not legally permitted to take, as well as a threat to take action that Smith Debnam was not legally permitted to take, that violated 15 U.S.C. § 1692e(5) of the FDCPA. Finally, it was a false representation and deceptive means of attempting to collect a debt that violated 15 U.S.C. § 1692e(10) of the FDCPA.

## COUNT TWO
### Violations of the North Carolina Debt Collection Act
### N.C. Gen. Stat. § 75-50 *et seq.*

43. Plaintiff incorporates by reference the allegations of paragraphs 1 through 39 as if fully repeated here.

44. First Tech's act of sending the letter dated September 20, 2017 (which is attached as **Exhibit A**) was a "fraudulent, deceptive, [and] misleading representation" prohibited by N.C. Gen. Stat. § 75-54 in that it stated that Mr. Sanders was delinquent in payments on a debt that, as First Tech later admitted, had ceased to exist. The act of sending the letter was also an "unconscionable means" of attempting to collect a debt prohibited by § 75-55(2), in that First Tech was not legally entitled to collect the fake debt on which it was demanding payment. The act of sending the letter was also an "unfair threat" prohibited by § 75-51(8), in that the letter threatened "legal action" to recover a nonexistent debt,

8

Case 1:19-cv-00410-UA-JEP   Document 3   Filed 10/24/19   Page 8 of 10

which is not permitted by law, and § 75-51(3), in that it threatened to make false accusations concerning Mr. Sanders to credit reporting agencies.

45. First Tech's act of sending the letter dated September 28, 2017 (which is attached as **Exhibit B**) was a "fraudulent, deceptive, [and] misleading representation" prohibited by N.C. Gen. Stat. § 75-54 in that it stated that Mr. Sanders owed a $33,881.50 debt that, as First Tech later admitted, had ceased to exist, and § 75-54(6), in that it falsely stated that the costs of the sale of the Murano would be added to Mr. Sanders's total amount due. The act of sending the letter was also an "unconscionable means" of attempting to collect a debt prohibited by § 75-55(2), in that First Tech was not legally entitled to collect the fake debt on which it was demanding payment. The act of sending the letter was also an "unfair threat" prohibited by § 75-51(3), in that it threatened to make false accusations concerning Mr. Sanders to credit reporting agencies.

46. First Tech's act of sending the letter dated November 2, 2017 (which is attached as **Exhibit d**) was a "fraudulent, deceptive, [and] misleading representation" prohibited by N.C. Gen. Stat. § 75-54 in that it stated that Mr. Sanders owed a $11,131.23 debt that, as First Tech later admitted, had ceased to exist. The act of sending the letter was also an "unconscionable means" of attempting to collect a debt prohibited by § 75-55(2), in that First Tech was not legally entitled to collect the fake debt on which it was demanding payment. The act of sending the letter was also an "unfair threat" prohibited by § 75-51(3), in that it

9

threatened to make false accusations concerning Mr. Sanders to credit reporting agencies.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff demands a trial by jury on all claims herein so triable.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff Ronnie Sanders prays he be awarded:

A. Actual damages;

B. As to Smith Debnam, $1,000 in statutory damages;

C. As to First Tech, the maximum civil penalty of $4,000 for each violation of the North Carolina Debt Collection Act for a total of $12,000;

D. As to First Tech, punitive damages;

E. Attorney fees, litigation expenses, and costs; and

F. Any other relief that this Court deems appropriate under the circumstances.

Dated: October 24, 2019
    Winston-Salem, NC

                              LAW OFFICE OF JONATHAN R. MILLER, PLLC
                              d/b/a SALEM COMMUNITY LAW OFFICE

                              By: /s/ Jonathan R. Miller
                                  Jonathan R. Miller
                                  Plaintiff's Attorney